# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **POTTSGROVE SCHOOL DISTRICT,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **D.H., et al.,** | : | **No. 17-2658** |
| *Defendants.* | : | |

## MEMORANDUM

PRATTER, J.                                                                 SEPTEMBER 10, 2018

### INTRODUCTION

D.H., a student diagnosed with autism, attended an elementary school in the Pottsgrove School District from kindergarten to second grade. During that time, D.H. maintained grade level performance in academics but failed to make progress as a result of severe behavioral issues, including toileting accidents and violent outbursts requiring physical restraints.

Through his mother, D.H. sued the school district pursuant to the Individuals with Disabilities Education Act, arguing that the school district's behavioral plan deprived him of a free appropriate public education. After a hearing, an educational hearing officer agreed with D.H. and his mother. The school district filed a complaint here appealing that hearing officer's conclusion. D.H. filed a counterclaim seeking relief related to the hearing officer's monetary award.

The school district filed a motion to dismiss the counterclaim and a motion for judgment on the administrative record. For the reasons that follow, (i) the school district's motion for judgment on the administrative record is granted in part and denied in part, (ii) the school

district's motion to dismiss the counterclaim is deemed moot, and (iii) the case is remanded to the hearing officer for proceedings consistent with this Memorandum.

BACKGROUND

D.H. is an elementary school student with autism living with his mother, N.H., in Pottstown, Pennsylvania. He is eligible for special education services under the categories of emotional disturbance and speech/language impairment. He is prone to emotional outbursts that sometimes include violent behavior like throwing furniture and pulling hair. In addition, D.H. struggles with toileting issues.

From kindergarten to second grade, D.H. attended a public school in the Pottsgrove School District. During this time, D.H.'s academic achievement was at or above grade level.

His behavior, on the other hand, suffered. During his three years at the Pottsgrove school, school personnel physically restrained D.H. over 25 times, including one incident in which personnel called the police. In addition, D.H. had at least 43 toileting accidents. This section summarizes D.H.'s performance from pre-kindergarten through second grade and highlights his education team's periodic responses to his behavior.[1]

But first, a word on recurring jargon or terms of art in this Memorandum.

- "**IEP**" stands for individualized education plan, the plan that a school district must establish (and revise as needed) for a student with disabilities.

- The "**IEP team**" is the group of stakeholders — including school staff and the student's family members — that fashions the IEP.

- "**FBA**" stands for functional behavior assessment, one source of data that the IEP team may (and sometimes *must*) consider in crafting an IEP.

---

[1] A more detailed account of D.H.'s performance in school, and his support team's periodic meetings, is available in the Appendix at the end this Memorandum.

2

- A "**BCBA**" is a board certified behavior analyst, a kind of behavior specialist whose appropriate role in the education of a student like D.H. is disputed by the parties in this case.

- A student's IEP is meant to provide a "**FAPE**," or free appropriate public education, which is the holy grail of the Individuals with Disabilities Education Act. Whether D.H. was denied a FAPE is the central question in this case.

## I. D.H.'s Pre-Kindergarten (Early 2013)

In the spring of 2013, to prepare for his transition to kindergarten, D.H. underwent a "transition evaluation." The transition evaluation was partially based on a behavior analysis from the staff at D.H.'s preschool, not from a behavior specialist or BCBA. Hearing Officer Decision (HOD) at 4, ¶ 11. The goals for D.H. set out in the evaluation fall into four categories:

- **Speech/language**. D.H.'s goals included formulating questions, developing a personal narrative, and retelling stories.

- **Physical therapy**. D.H.'s goals included writing his name and improving his independent dressing and feeding.

- **Occupational therapy**. D.H.'s goals included improving core and leg strength.

- **Behavioral**. D.H.'s goals included toileting, vocal self-expression, and interactions with peers. Examples of his problem behavior included throwing furniture, punching and kicking staff, scratching and pulling hair, and screaming.

*See* HOD at 3, ¶¶ 5–10.

Armed with the transition evaluation, the IEP team met to craft an IEP for D.H. *See* HOD at 4, ¶¶ 14–20. Although the IEP included a behavior plan, it did not directly address toileting issues. The closest that the IEP came to a toileting plan was a "specifically designed

3

instruction" requiring "shaping" — that is, rewarding good behavior — "for aversive tasks such as toileting." HOD at 4, ¶ 16.

## II. D.H.'s Kindergarten (2013-2014)

In kindergarten, the three education plans that school officials designed for D.H. did not include a clearly defined plan for toileting. And the crux of the plans — that under no circumstances should D.H. escape unwanted tasks — was ignored. Instead, it appears that D.H. learned that by acting out, he could avoid various tasks and receive special attention.

In October 2013, the IEP team met to revise the education plan. *See* HOD at 5, ¶¶ 22–26. Neither a behavior specialist nor a BCBA participated. This absence is notable because the IEP team added the use of physical restraints to the IEP as a last resort when D.H. was a danger to himself or others.[2]

In March 2014, the IEP team met to make slight revisions to the education plan. *See* HOD at 6, ¶¶ 32–37.

A month later, the IEP team again met to revise the education plan. *See* HOD at 7. An eight-step "crisis plan" was added to address D.H.'s outbursts. A toileting goal of no accidents for four weeks was added, with no mention of how the goal would be reached. D.H. was re-designated for the most intensive "full-time autistic support," meaning that he now would spend five hours per day with a personal care assistant. Finally, D.H. was deemed eligible for summer school for 2014.

---

[2] In the context of the IDEA, "restraint" refers to "[t]he application of physical force, with or without the use of any device, for the purpose of restraining the free movement" of a student's body." 22 Pa. Code § 14.133(b). "[B]riefly holding" a student "to calm or comfort him," "guiding" a student to an appropriate activity, and holding hands do not qualify as restraints. *Id.* Prone restraints — in which a student "is held face down on the floor" — are prohibited in educational settings. *Id.* § 14.133(c)(3).

From January to June 2014, D.H. had at least 18 toileting accidents, was physically restrained six times, and was picked up early from school 15 times.  HOD at 5, ¶¶ 29–30.

**III.    D.H.'s First Grade (2014-2015)**

The IEP from April of D.H.'s kindergarten year, summarized immediately above, carried over into first grade.  The IEP team was not reconvened until April of that year.  During the first seven months of first grade, D.H. had the following behavioral incidents:

- **Restraints**: seated restraints were used 10 times.

- **Toileting**:  D.H. had 13 toileting accidents.

- **Early Pick-Up**: Behavioral issues necessitated early departure from school roughly once each week.

*See* HOD at 8, ¶¶ 52–58.  At times, D.H.'s personal care assistant responded to his bad behavior with redirection, in contravention of the extant behavior plan.  For example, the personal care assistant called autistic support specialists when D.H. acted out — thereby encouraging him to act out by providing access to his preferred staff members.

Even so, no changes were made to D.H.'s education plan until April of first grade.  When the IEP team met in April 2015, it deemed D.H. ineligible for summer school for 2015.  HOD at 10, ¶ 71.

Overall, D.H. had at least 16 toileting accidents and was restrained at least 11 times in first grade.  He reportedly made no progress in his communication skills or task completion.

**IV.    D.H.'s Second Grade (2015-2016)**

In second grade, the violent outbursts, toileting accidents, and restraints continued.  The education team met in October, November, December, and March to address D.H.'s issues.

In September of second grade, D.H. was restrained multiple times on three separate days, *see* HOD at 10, ¶¶ 72–75, leading the IEP team to hold an informal meeting in early October.

Because D.H.'s problem behaviors persisted after the informal meeting, a formal IEP meeting was convened in November. *See* HOD at 12, ¶¶ 91–99. The IEP team revised the behavior plan to respond to elopement, which occurs when children with autism sometimes wander off. The plan provided a response to elopement, not a strategy to prevent elopement.

In December 2015, the IEP team met twice to revise the education plan. *See* HOD at 13, ¶¶ 102–09. The team revised the "crisis" portion of the behavior plan. Staff members were instructed not to talk to D.H. when he was not behaving, and they changed procedures for notifying D.H.'s parent during a crisis.

Also in December 2015, D.H.'s mother asked for a formal reevaluation of D.H.'s status in order to facilitate a possible transfer to a program outside the school district. The reevaluation included a functional behavior assessment — D.H.'s first since before kindergarten. This was the only FBA conducted by a BCBA. In February 2016, the report was finalized:

- **Academics**. The report found that D.H. was on grade level in math and reading, with average writing skills. He was academically "on track" for second grade.

- **Behavior**. The FBA concluded that D.H.'s negative behavior was to gain adult attention and avoid unwanted tasks. The assessment posited that the school district's behavior plan had been backfiring by encouraging D.H.'s bad behavior. In addition, the BCBA concluded that D.H.'s teachers were providing him with no positive reinforcement or verbal praise.

- **Toileting**. The report found that toileting skills were one of D.H.'s three critical needs. The others were emotional control and improving problem solving.

*See* HOD at 14–15, ¶¶ 120–25.

In light of the reevaluation report, the IEP team convened in March and April 2016 to revise the IEP. *See* HOD at 15–16, ¶¶ 127–29. The IEP team added antecedent strategies — that is, strategies to address behavior that precedes problem behavior. In addition, the team revised the plan to include positive consequences for replacement behavior (that is, good behavior that D.H. exhibits to replace unwanted behavior).

D.H. continued to exhibit problem behaviors, and, in April 2016, the school district recommended that D.H. transfer to an approved private school (APS). D.H. began attending the APS on May 9, 2016. He attended extended school year there during the summer of 2016 and remains there today. His IEP team now regularly consults with a board certified behavior analyst, and reportedly D.H. has experienced noted behavior improvement, including in toileting. *See* HOD at 16, ¶¶ 130–36.

**PROCEEDINGS BEFORE THE HEARING OFFICER**

In August 2016, D.H.'s mother N.H. brought a complaint against the Pottsgrove School District. *See* Am. Due Process Compl., Doc. No. 14-3. According to the requirements of the IDEA, a hearing officer, Dr. Linda M. Valentini, presided over a special education due process hearing on November 18 and December 13, 2016. At that hearing, N.H. argued that the school district failed to provide a free and appropriate public education for D.H.'s first and second grade years from 2014 to 2016. His kindergarten year was outside the applicable statute of limitations and, hence, was not at issue.

In March 2017, the hearing officer ruled in favor of N.H., concluding that the school district had indeed denied D.H. a free and appropriate public education during his entire time at the Pottsgrove school. *See* HOD at 20. Although the hearing officer explained that her conclusion rested on two overarching factors, as the Court analyzes the issues, a thorough

analysis of the hearing officer's decision warrants rearranging the many grounds supporting the officer's conclusion into a more accessible outline. Accordingly, the three subsections that follow (1) summarize the hearing officer's two "factors" ostensibly leading to her decision, (2) recast her reasoning into a somewhat more nuanced outline, and (3) explain the hearing officer's conclusion as to the remedy afforded to D.H.

## I. The Two "Factors" Supporting the Hearing Officer's Conclusion

The hearing officer rested her conclusion on two broad factors:

1) *The absence of important "voices" during IEP meetings.* The IEP meetings often lacked participation from any behavior specialist and other supposedly essential IEP team members.

2) *Inadequate behavior plans in D.H.'s IEPs.* Rather than proactive and preventative plans correctly implemented, D.H. was subject to a series of reactive plans that were poorly implemented.

For the hearing officer, these two factors contributed to an environment that thwarted D.H. from receiving a FAPE. *See* HOD at 24–26.

## II. The Court's Understanding of the Hearing Officer's Decision

Examining the evidence cited by the hearing officer to support her decision, the Court considers it worthwhile to reorganize the inputs the officer considered. Essentially, the hearing officer identified three major flaws in the educational programming that D.H. received: (A) flaws in plan **formulation**, (B) flaws in plan **content**, and (C) flaws in plan **implementation**.

### A. *Plan Formulation*

By "plan formulation," the Court means the process by which the IEP team decided on an educational plan for D.H. The hearing officer appears to have identified three main flaws in the

formulation process: (1) attendance at IEP meetings, (2) data collected and considered at meetings, and (3) in one instance, the failure to call a meeting in the first place.

*1. Attendance at IEP Meetings*. — The hearing officer repeatedly noted that certain educational professionals failed to attend several IEP meetings. With a more consistent "seat at the table," each of these professionals supposedly could have offered viewpoints that, the hearing officer seems to have believed, would have kept D.H.'s IEP on the right track.

*BCBA*. No BCBA or other behavior specialist attended the May 2, 2013 IEP meeting in D.H.'s pre-kindergarten period. *See* HOD at 20. None attended the April 16, 2014 IEP meeting during D.H.'s kindergarten year, even though changes were made to D.H.'s behavior plan. *See id.* None attended the April 7, 2015 IEP meeting during D.H.'s first grade experience. *See id.* at 21. And none attended the October 2, 2015 informal meeting during second grade, even though the meeting was called because of D.H.'s aggressive behavior and the staff's use of restraints. *See id.*

*Regular Classroom Education Teacher*. D.H.'s regular education teacher did not attend the October 16, 2013 IEP meeting in the kindergarten term, even though D.H. had been in the regular classroom environment. HOD at 20. The regular education teacher did not attend the April 7, 2015 IEP meeting during first grade even though the education plan was revised to place D.H. in itinerant autistic support — that is, in the regular classroom environment. *Id.* at 21. And the regular education teacher did not attend the December 14, 2015 IEP meeting during second grade, even though D.H. had been in the regular classroom environment. *Id.*

*Supplemental therapists.* The speech/language therapist did not attend the October 16, 2013 IEP meeting in kindergarten, even though D.H. had a documented speech/language impairment. HOD at 20. The speech/language therapist, occupational therapist, and physical

therapist were all absent from the March 5, 2014 IEP meeting in kindergarten. *Id.* The speech/language therapist did not attend the April 7, 2015 IEP meeting in first grade, even though speech/language therapy was discontinued at the meeting. *Id.* at 21. Finally, neither the occupational therapist nor the physical therapist were present at the December 22, 2015 IEP meeting during D.H's second grade year, even though several of D.H.'s behavioral incidents occurred during those therapies. *Id.*

   **2. *Lack of Information at IEP Meetings***. — The hearing officer repeatedly expressed that the IEP team could have gathered more information in anticipation of an IEP meeting. In her estimation, incomplete data on D.H.'s behavior led to inadequate educational planning at the IEP meetings.

   *Lack of FBA.* The functional behavioral assessment in pre-kindergarten was not conducted by a BCBA. HOD at 20. No FBA was conducted while D.H. was in kindergarten or first grade. *Id.* at 20–21. When an FBA was conducted in February of D.H.'s second grade year, its findings persuaded the IEP team to revise the behavior plan in nearly every area. According to the hearing officer, the dramatic effect of the second-grade FBA demonstrates how valuable an FBA would have been in kindergarten or first grade. *Id.* at 22–23.

   *Lack of Interactions between D.H. and a BCBA.* The March 5, 2014 IEP in kindergarten did not provide for ongoing consultation with a BCBA. HOD at 20. No BCBA met with D.H. in first grade. *Id.* at 21. At the end of second grade, once D.H. moved to his new school and had regular interaction with a BCBA, his educational team could finally use data collected by a BCBA to calibrate an appropriate behavior plan. D.H.'s behavior improved substantially. *Id.* at 22–23. Because no BCBA interacted with D.H. for several years at the Pottsgrove school, the

hearing officer concluded that the IEP team was deprived of the valuable insights that a BCBA could have offered.

*Lack of Behavior Data*.  Short of direct observation by a BCBA, it appears the school could have had other staff collect data, which a BCBA then could have analyzed before making recommendations to the IEP team.  Indeed, one staff member was in a position to gather data: the personal care assistant, a one-on-one aide who spent five hours per day with D.H. for much of his time as a Pottsgrove student.  HOD at 22.

**3. Failure to Call an IEP Meeting Sooner in First Grade**. — Despite 11 occasions for resorting to restraints and 16 toileting accidents during D.H.'s first-grade year, no IEP meeting was held until April.  HOD at 21.  The hearing officer concluded that this failure to call a meeting is a process failure of its own — a failure to formulate an IEP revision in the first place.

### B.  Plan Content

The second major flaw in D.H.'s educational programming was the content of the educational plans themselves.  In the hearing officer's telling, poorly crafted IEPs deprived D.H. of a FAPE.  Four errors in the realm of plan content loom largest:

**1. Incomplete Toileting Plans**. — The hearing officer faulted the pre-kindergarten IEP of May 3, 2013 and the kindergarten IEP of April 16, 2014 for failing to include a goal or behavior plan for toileting.  *See* HOD at 22.  As mentioned above, the closest that these IEPs came to a toileting plan was a "specifically designed instruction" requiring "shaping" — that is, rewarding good behavior — "for aversive tasks *such as toileting*."  HOD at 4, ¶ 16 (emphasis added).

**2. Reactive Plans**. — The hearing officer faulted the school district's plans for reactively bouncing from crisis to crisis, rather than proactively "supporting" D.H.  The behavior component of the October 16, 2013 IEP in kindergarten included only procedures for when D.H.

acted out, not prevention strategies. HOD at 22. Notably, when D.H. was in second grade, the November 6, 2015 IEP was revised to respond to cases of elopement, not to prevent them in the first place. *Id.* at 22–23. More reactive steps were added in December 2015. *See id.* (noting that the plan specified when D.H.'s mother would be called during a crisis). The FBA, taken in February of D.H.'s second-grade year, revealed that these reactive strategies backfired because they taught D.H. that he would receive attention for acting out. *Id.*

*3. Insufficient Revisions in First Grade*. — The parties dispute whether D.H. was on an upward trajectory in first grade. The hearing officer found that he was not and that, therefore, the trivial revision to the behavior plan made at the IEP meeting on April 7, 2015 — namely, the elimination of a single reinforcement item — was the wrong approach to the content of the plan. HOD at 22.

*4. Lack of Interactions between D.H. and a BCBA*. — The March 5, 2014 IEP in kindergarten did not provide for ongoing consultation with a BCBA. HOD at 20. No BCBA met with D.H. in first grade. *Id.* at 21. At the end of second grade, D.H. moved to his new school and had regular interaction with a BCBA. *Id.* at 22–23. His behavior improved substantially. *Id.* The hearing officer interpreted these events by concluding that, because interactions with a BCBA led to improvements in D.H.'s behavior, the IEP team's prior failure to provide for such interactions was unwise. *Id.*

### C. Plan Implementation

The hearing officer noted several ways in which the IEPs were poorly implemented. This flaw is distinct from any error in the plans' *formulation* or *content*; even the most thorough IEP, crafted according to the most rigorous process, may be carried out in an inadequate manner. For instance, school staff did not follow the February 2014 behavior plan when they restrained D.H. twice on March 7, 2014. HOD at 22. During a behavior incident on a school bus in second

grade, a bus aide was not trained in D.H.'s behavior plan. *Id.* at 22–23. Also in second grade, during particularly problematic behavior on January 28, 2016, school staff encouraged D.H. to use words — a strategy contrary to his behavior plan that caused D.H. to become aggressive. *Id.*

## III. The Hearing Officer's Two-Part Order on Remedy

In terms of remedies, first, the hearing officer ordered that a BCBA attend all of D.H.'s future IEP meetings. HOD at 27.

Second, she ordered that the school district pay for compensatory education to D.H. She reasoned that it was too hard to determine how many hours of extra education would be needed make D.H. "whole" — that is, to put him in the position he would have been in without the denial of FAPE. So she opted for the "hour-for-hour" approach to compensatory education, awarding one hour of compensatory education for every hour she determined that FAPE was denied. HOD at 19.

Accordingly, the hearing officer needed to arrive at a specific number of hours to award. Because D.H.'s behavioral progress was impeded but his academic progress was "on track," the hearing officer apparently equated these two broad categories and determined to split the difference, awarding a half-day — four hours — of compensatory education for each day of first and second grade. Although she found that FAPE was also denied in kindergarten, that year was outside the statute of limitations, and so was not part of her calculations. In addition, she awarded hours for the entire time that D.H. should have been in ESY in the summer after first grade. HOD at 26.

As for the exact value of the hours awarded, the hearing officer stated only that the hours should be valued at "the usual and customary rate charged by providers of educational, developmental and therapeutic services" in the region. HOD at 27.

PROCEDURAL HISTORY SINCE THE HEARING

In June 2017, the school district appealed the hearing officer's decision to this Court, alleging multiple errors of fact and law. D.H. counterclaimed, asking for money damages for each hour of compensatory education in the form of a third-party trust.

The school district has filed a motion to dismiss the counterclaim and a motion for judgment on the administrative record. The Court heard oral argument on February 20, 2018.

## STANDARD OF REVIEW

In IDEA cases, courts must give "due weight" to administrative proceedings such as the hearing officer's factual findings here. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). "Factual findings from the administrative proceedings are to be considered prima facie correct." *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (also calling this standard "modified de novo"). Courts review conclusions of law de novo. *S.H.*, 336 F.3d at 269.

## HEARING OFFICER CONCLUSIONS ON LIABILITY

"Disability is a natural part of the human experience." 20 U.S.C. § 1400(c)(1). The Individuals with Disabilities Education Act exists to "ensur[e] children with disabilities and the families of such children access to a free appropriate public education." *Id.* § 1400(c)(3).

The term "free appropriate public education" encompasses both "special education and related services" that must meet several requirements, including (i) satisfaction of state educational standards, (ii) an "appropriate" elementary school education, and (iii) conformity with the child's "individualized education program." *Id.* § 1401(9)(B)–(D); *see also* 34 C.F.R. § 300.17(b)–(d) (same requirements laid out in implementing regulation); *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524–25 (2007) (summarizing the definition of FAPE).

"A FAPE is an education 'specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'" *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006) (quoting *Rowley*, 458 U.S. at 188–89). "The education provided must be sufficient to confer some educational benefit upon the handicapped child, although the state is not required to maximize the potential of handicapped children." *Id.* (quotations omitted).

The individualized education plan is the key to ensuring that a child with disabilities receives a FAPE. The IEP is the written plan of action for each child with a disability. 20 U.S.C. § 1414(d)(1)(A)(i); *see also id.* § 1401(14) (defining IEP). An IEP includes both "a statement the child's present levels of academic achievement and functional performance" and "a statement of measurable annual goals, including academic and functional goals." *Id.* § 1414(d)(1)(A)(i)(I)–(II).

The team that develops the IEP must take a holistic approach, considering parental "concerns" and the child's "strengths" and "academic, developmental, and functional needs." 20 U.S.C. §§ 1414(d)(3)(A)(i), (ii), (iv). The focus is on the individual child. "The instruction offered must be '*specifically* designed' to meet a child's '*unique* needs' through an '[*i*]*ndividualized* education program.'" *Endrew F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 999 (2017) (quoting 20 U.S.C. §§ 1401(29), (14)). The goal of the plan escapes precise definition: the IEP must be reasonably calculated to give a student with disabilities the chance to receive a "meaningful educational benefit." *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999).

When, as here, a court must evaluate an IEP after the fact, its inquiry is fact bound. "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was

created." *Endrew F.*, 137 S. Ct. at 1001. "This absence of a bright-line rule, however, should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* (quoting *Rowley*, 458 U.S. at 206). Monday-morning quarterbacking is prohibited: to determine whether a child has received a free and appropriate public education, the education plan must be evaluated at the time it was issued. *See Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 534 (3d Cir. 1995). "[S]o long as the IEP responds to the [student's] needs, its ultimate success or failure cannot retroactively render it inappropriate." *Id.*

As explained in the summary of the hearing officer's decision, above, the hearing officer found that FAPE was denied because of flaws in (i) plan formulation, (ii) plan content, and (iii) plan implementation. The school district does not appear to challenge the hearing officer's conclusions as to plan implementation. Thus, the Court addresses only the first two categories.

## I. Plan Formulation

As explained above, the hearing officer found three flaws in the process of IEP formulation: (1) the absence of certain key staff members at various IEP meetings, (2) the lack of involvement by a BCBA in an FBA or otherwise, and (3) the failure to convene an IEP meeting sooner in D.H.'s first-grade year. The Court evaluates the legal validity of each claimed flaw in turn.

### A. Attendance at IEP Meetings

The hearing officer faulted the school district for failing to ensure attendance at D.H.'s educational team meetings by (1) the regular education teacher and (2) certain other staff members. For the reasons that follow, the Court concludes that only one absence by the regular education teacher could properly count against the school district.

*1. **Regular Education Teacher**.* — The hearing officer found that the regular education teacher was absent from three IEP meetings, on October 16, 2013, April 7, 2015, and December 14, 2015. HOD at 20–21. The regular education teacher must, "to the extent appropriate, participate in the development of the IEP." 20 U.S.C. § 1414(d)(3)(C). And when the team convenes to "review and revis[e]" the IEP, the regular education teacher must participate. *Id.* § 1414(d)(4)(B).

Here, it appears that two of the three "absences" are accounted for. The teacher did in fact attend the IEP meeting in December 2015. And D.H.'s mother signed a release excusing the teacher from attending the meeting in April 2015. *See* 20 U.S.C. § 1414(d)(1)(C)(ii) (allowing such excused absences); 34 C.F.R. § 300.321(e)(2) (same); *see also Questions and Answers on Individualized Education Programs (IEPs), Evaluations, and Reevaluations*, 47 IDELR 166, at *13 (OSERS June 2010) (explaining that excused absences are "intended to provide additional flexibility to parents in scheduling IEP Team meetings and to avoid delays in holding an IEP Team meeting"); *Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities*, 71 Fed. Reg. 46540-01, 46673 (Aug. 14, 2006) (same). Only the teacher's absence from the October 2013 meeting appears to be unexcused. A sole unexcused absence in three years diminishes — but does not fully extinguish — the force of the hearing officer's conclusion on this point.

*2. **Other Staff Members**.* — The hearing officer faulted the school district for not having a behavioral analyst, speech/language therapist, occupational therapist, or physical therapist at several education plan meetings. But such participants are not required under the IDEA.

The IEP team must include (i) the parents of the student, (ii) the regular education teacher, (iii) the special education teacher, and (iv) a representative of the school district. *See* 20

U.S.C. § 1414(d)(1)(B)(i)–(iv); 34 C.F.R. § 300.321(a)(1)–(4).  In addition, "at the discretion of the parent or the [school district]," the IEP team may include "other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate."  20 U.S.C. § 1414(d)(1)(B)(vi); 34 C.F.R. § 300.321(a)(6).

The term "related services personnel" encompasses speech/language therapists, occupational therapists, and physical therapists.  *See* 20 U.S.C. § 1401(26)(A) (defining the term "related services" to mean, in part, "speech-language pathology and audiology services" and "physical and occupational therapy").  And a BCBA or behavioral analyst would arguably qualify as an individual with "knowledge or special expertise regarding the child" under the statutory definition of the IEP team.

But it does not appear that either the parent or school district exercised their statutory "discretion," *id.* § 1414(d)(1)(B)(vi), to include these staff members in the IEP meetings in question.  The hearing officer made no finding to that effect.  Therefore, the hearing officer erred when she blamed the school district for not ensuring the attendance of these staff members.

*3.  Conclusion*. — The hearing officer erred by blaming the school district for (i) all but one of the absences of the regular education teacher, and (ii) the absences of the behavioral analyst, speech/language therapist, occupational therapist, and physical therapist.  Because the hearing officer's ultimate conclusion rested on several factors, the Court will not determine these errors alone warrant reversal.  On remand, however, the hearing officer should critically reevaluate her conclusions in light of the Court's instruction that only a single absence by the regular education teacher may "count" against the school district.

### B.  FBA Based on Direct Observation by a Behavior Specialist

The school district argues that the hearing officer erred by requiring a board certified behavioral analyst to conduct a functional behavior assessment through direct observation of

D.H's behavior. The Court agrees: the hearing officer's mandate of a new FBA by a BCBA, even though one had been conducted in pre-kindergarten, held the school district to a standard decidedly more stringent than that required by the IDEA.

**1. An FBA is not always required**. — The school district is correct that the IDEA does not generally require any specific way to address a student's behaviors. An FBA is not listed among the statutory components of an IEP. *See* 20 U.S.C. § 1414(d)(1)(A)(i). What is more, the listed components are followed by a "Rule of Construction," explaining that "[n]othing in this section shall be construed to require . . . that additional information be included in a child's IEP *beyond what is explicitly required in this section*." *Id.* § 1414(d)(1)(A)(ii)(I) (emphasis added); *cf. Robert B. v. W. Chester Area Sch. Dist.*, No. CIV.A. 04-CV-2069, 2005 WL 2396968, at *7 (E.D. Pa. Sept. 27, 2005) ("The IDEA does not require that the District go beyond identifying needs and goals related to behavior."). In a section entitled "Development of IEP – Special Factors," the statute provides only that, "in the case of a child whose behavior impedes the child's learning or that of others," the IEP team shall "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." *See* 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i) (same). An FBA is an option, but it is not inexorably a hard-and-fast requirement.

**2. The FBA taken in pre-kindergarten satisfied the requirement of an FBA here**. — If the IEP includes a positive behavior support plan, as D.H.'s did, then an FBA is required. "Behavior support programs and plans must be based on a functional assessment of behavior . . . ." 22 Pa. Code § 14.133(a); *see also id.* § 14.133(b) ("A positive behavior support plan shall be developed by the IEP team, be based on a functional behavior assessment, and become part of the . . . student's IEP."); *id.* § 711.46 (same).

Here, D.H.'s first IEP, crafted during his pre-kindergarten experience, relied on the "transition evaluation" that itself was based on an FBA. That pre-kindergarten FBA hypothesized that D.H.'s misbehavior was "a means to avoid non-preferred tasks and continue with preferred tasks" and "gain adult attention." Compl. ¶ 30. The hearing officer erred by failing to acknowledge the pre-kindergarten FBA. *See* HOD at 4, ¶ 11 (stating that no FBA was conducted).

D.H. advances three arguments for why the pre-kindergarten FBA was inadequate. None has merit.

First, D.H. argues that the pre-kindergarten FBA was inadequate because D.H. soon moved to a new, unfamiliar kindergarten environment. Of course, it might have been subjectively preferable to revisit D.H.'s FBA in his new environment. But pedagogically preferred or wise is not the same as statutorily required. And the notion that another FBA would have revealed new information is undercut by the fact that the pre-kindergarten FBA hypothesis — that D.H. misbehaves to avoid certain tasks and gain adult attention — was nearly identical to the FBA eventually taken in second grade. *Compare* Compl. ¶ 30 (pre-kindergarten hypothesis)*, with* HOD at 14–15, ¶¶ 120–25 (second grade FBA).

Second, D.H. argues — and the hearing officer agreed — that only an FBA conducted by a BCBA or other behavioral expert would be adequate. Because the pre-kindergarten FBA was not conducted by a BCBA, the argument goes, it contributed to the denial of FAPE.

But there is no preconceived requirement that only certain persons can conduct an FBA. "There is no . . . requirement . . . that a Board Certified Behavioral Analyst (BCBA) conduct the FBA." *See* Letter from Tracy R. Justesen, Assistant Secretary, Office of Special Education and Rehabilitative Services, U.S. Dep't of Education, to Ylise Janssen, Office of the General

Counsel, Austin Independent School District, 51 IDELR 253 (OSERS June 5, 2008). There is no firm requirement about who performs an FBA because "IEP teams need to be able to address the various situational, environmental and behavioral circumstances raised in individual cases." *See* Assistance to States for the Education of Children With Disabilities and the Early Intervention Program for Infants and Toddlers With Disabilities, 64 Fed. Reg. 12406-01, 12620 (Mar. 12, 1999). To be sure, BCBAs may well be "uniquely situated as valuable members of educational teams." *See* Pennsylvania Department of Education, Board Certified Behavior Analysts and Public Education: Rationale and Guidelines, Doc. No. 16, Ex. E, at 2. Valuable though BCBAs are, however, there is no legal requirement that they conduct FBAs.

Third, D.H. argues that the pre-kindergarten FBA was inadequate because it was not based on direct observation. Likewise, the hearing officer required an FBA be conducted based on direct observation.

There is no statutory support for a requirement of direct observation. The only support offered by D.H., namely, a Pennsylvania Department of Education circular, was issued after the events in question. *See* Pennsylvania Department of Education, Functional Behavioral Assessment Process (May 2016), Doc. No. 16, Ex. F, at 2 ("Information also should be gathered by collecting data through direct observation of the behavior across settings and times."). The circular in place at the time at issue did not include any such rigid requirement: "There is no one way to complete an FBA; rather the goal of this process is to develop a testable hypothesis." *See* Doc. No. 17, Ex. A, at 2.

*3. **An additional FBA was not required in this case**.* — At least three other specific factual circumstances can trigger a process that concludes with an FBA. None apply to this case.

First, when restraints are used on a student, the student's IEP team must meet to "consider whether the student . . . needs a functional behavioral assessment." 22 Pa. Code § 14.133(c)(1). After restraints were used in this case, however, it appears that D.H.'s mother N.H. "agree[d] in writing to waive the meeting." *Id.* In any event, this provision requires only that the team *consider* an FBA, not that one necessarily be conducted.

Second, the Pennsylvania Department of Education recently explained that "[a]n FBA must be conducted" whenever the IEP team "determines that a student's behavior is interfering with his/her learning or the learning of others." Pennsylvania Department of Education, Functional Behavioral Assessment Process 3 (May 2016), Doc. No. 16, Ex. F. Although D.H.'s behavior presumably often interfered with the learning environment, this DOE instruction was issued after the events at the Pottsgrove school. Mindful that "[r]etroactivity is not favored in the law," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), the Court declines to apply the DOE instruction now. *See generally* Cass R. Sunstein & Adrian Vermeule, *The Morality of Administrative Law*, 131 Harv. L. Rev. 1924, 1944 (2018) (expanding upon and critiquing this retroactivity principle).

Third, if a school decides to "change the placement of a child with a disability because of a violation of a code of student conduct," then the IEP team must make several determinations about the child's behavior, including whether "conduct in question was caused by, or had a direct and substantial relationship to, the child's disability." 34 C.F.R. § 300.530(e)(1)(i). If so, then the IEP team must either:

> (i) Conduct a functional behavioral assessment, *unced* the [local educational agency] had conducted a functional behavioral assessment before the behavior that resulted in the change of placement occurred, and implement a behavioral intervention plan for the child; *or*

(ii) If a behavioral intervention plan already has been developed, review the behavioral intervention plan, and modify it, as necessary, to address the behavior.

*Id.* § 300.530(f)(1) (emphasis added). Thus, an FBA is only one of two options, and even then, only if one had not already been conducted. In short, this provision did not mandate a new FBA in D.H.'s case.

  ***4. Conclusion***. — The hearing officer erred by (i) failing to acknowledge the FBA performed during pre-kindergarten and (ii) requiring an FBA based on direct observation by a BCBA. During oral argument in this case, the parties flatly disagreed on whether these erroneous conclusions were necessary to the hearing officer's ultimate conclusion. Because the hearing officer's decision rested on several interlocking factors, the Court cannot necessarily conclude which factors were necessary to her ultimate conclusion. On remand, the hearing officer should reevaluate her conclusions in light of (i) the pre-kindergarten FBA and (ii) the Court's instruction that a subsequent FBA by a BCBA was not required by law.

  **C. Admissibility of Report by D.H.'s Behavioral Expert**

  During the hearing, the hearing officer admitted the report of N.H.'s behavioral expert Veronika Sweeny. That ruling arguably bears on the formulation of D.H.'s IEP because the expert report suggested that school district personnel did not have adequate expertise in behavioral issues, arguably then tainting the process of crafting an IEP. The school district advances three arguments challenging the decision to admit the Sweeny report. The Court concludes that only the third argument has merit but, in any event, that the decision to admit the expert report was inconsequential.

  ***First***, the Federal Rules of Evidence do not apply in educational due process hearings. Therefore, the school district's arguments based on *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), miss the mark.

*Second*, the school district argues that the expert report was offered into evidence too late. Ms. Sweeny originally sought to testify without a report, but the school district objected on November 18, 2016, the first day of the due process hearing. Because the school district insisted on a written report, Ms. Sweeny produced one on December 6, 2016, a week in advance of the second day of testimony on December 13. At the December 13 hearing, the hearing officer overruled the school district's objection to the admissibility of the report.

Now, the school district argues that the report should have been excluded because it was not disclosed five days before the first day of the hearing, in violation of the IDEA's five-day rule. "A party may prohibit the introduction of evidence at the hearing that has not been disclosed to that party at least 5-business days before the hearing." 22 Pa. Code § 14.162(k); *see also* 34 C.F.R. § 300.512(a)(3) ("Any party to a hearing . . . has the right to . . . [p]rohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least five business days before the hearing."). Based on the unequivocal wording of the rule, the school district's objection should have been enough to exclude the written report from evidence.

Evidentiary rules that vest discretion in the hearing officer do not apply to evidence like the expert report in this case. "A hearing officer *may* bar" — in other words, a hearing officer has the discretion to admit — certain evidence that violates the five-day rule. *See* 20 U.S.C. § 1415(f)(2)(B) (emphasis added). But this discretion applies only to "evaluations" and "recommendations," not to the written report at issue here. *See id.* § 1415(f)(2)(A); *see also* 34 C.F.R. § 300.512(b)(1)–(2) (same).

Although the hearing officer lacked any statutory or otherwise authorized discretion to admit the report, she arguably retained equitable discretion to admit it. To begin, a written expert report is not required in educational due process hearings. D.H. and N.H. only provided

one in response to the school district's request. What is more, the five-day rule exists to eliminate the element of surprise. The school district cannot claim to be surprised by a report that it specifically insisted on having. Timeliness, then, in this case, is no bar to the expert report's admissibility.

*Third*, the school district challenges the expert report on the merits. Ms. Sweeny did little independent research in drafting the report. She did not interview the special education teachers, the district's BCBA, the school principal, the speech/language therapist, D.H.'s home-based team, D.H.'s mother or grandparents, or even D.H. himself. In fact, she appears to have reviewed only information that was already in the record.

But precisely because the expert report was based only on information already in the record, this argument seems to be much ado about nothing. Any sources available to Ms. Sweeny were also already available to Hearing Officer Valentini; the report is therefore dispensable. Furthermore, the school district has not explained how the report, once admitted into evidence, affected the hearing officer's ultimate conclusion. Thus, even if the hearing officer erred in admitting the report, any error may be disregarded as inconsequential.

### D. The Hearing Officer's Conclusions about D.H.'s Progress in First Grade

The school district argues that D.H.'s first-grade year was not as bad as the hearing officer portrayed it. As a result, argues the district, the hearing officer erred by faulting the district for failing to convene an IEP meeting until April of that year.

The Court agrees that any assertion that first grade followed one constant trajectory oversimplifies the matter. But the hearing officer correctly identified the ups and downs of that year, carefully detailing D.H.'s performance. *See* HOD at 8–9, ¶¶ 52–69.

During the first seven months of first grade, D.H. had the following behavioral incidents:

- Restraints: seated restraints were used 10 times.

- Toileting: D.H. had 13 toileting accidents.

- Early Pick-Up: Behavioral issues necessitated early departure from school roughly once per week.

*See* HOD at 8, ¶¶ 52–58.  Even after the IEP meeting in April 2015, D.H. was subject to a seated restraint and had three toileting accidents.  *See* HOD at 9, ¶¶ 60–69.

What is more, the hearing officer found that the school district's formal records from first grade were incomplete.  *See* HOD at 7–8, ¶¶ 51–52.  For example, the school restrained D.H. 11 times in the first half of first grade, but only one of those was formally reported.  Without consistent data, the Court will not second-guess the hearing officer's factual findings about first grade.

First grade was also the second of three straight years in which D.H. apparently made no progress in toileting or in communicating his feelings.  *Cf. Endrew F.*, 137 S. Ct. at 996 (no free and appropriate education when the education plan "largely carried over the same basic goals and objectives from one year to the next, indicating that [the student] was failing to make meaningful progress toward his aims.").

Basically, the school district's dispute about D.H.'s performance in first grade is a fight over factual issues.  Given the parties' conflicting interpretations of the facts, and in light of the Court's obligation to assign "due weight" to the hearing officers factual findings, *see Rowley*, 458 U.S. at 206, the Court does not take up the school district's challenge to the hearing officer's factual assessment of first grade.

Moving from factual assessment to legal conclusion, then, the Court affirms the hearing officer's assessment of the IEP meeting in first grade.  Under the IDEA, the school district had an obligation to "ensure that . . . the IEP Team . . . revise[d] the IEP as appropriate to address . . .

any lack of expected progress toward the annual goals in the general education curriculum." *See* 20 U.S.C. § 1414(d)(4)(A)(ii)(I). As a matter of plan formulation, the district did not meet this obligation when it failed to call an IEP meeting until April of first grade.[3]

## II.  Plan Content

"Crafting an appropriate program of education requires a prospective judgment by school officials." *Endrew F.*, 137 S. Ct. at 999. "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal." *Id.* As explained in the summary of the hearing officer's decision, above, two of the claimed flaws in D.H.'s IEPs were the inadequate toileting plan and the reactive, crisis-oriented nature of the overall behavior plan. The Court affirms the hearing officer's conclusions as to these two flaws in D.H.'s education plans and notes two other deficiencies: D.H.'s ineligibility for ESY after first grade and the persistent use of physical restraints.

### A.  Toileting Plan

The school district challenges the hearing officer's conclusion that the IEP lacked an adequate toileting component. The IEP must include "a statement of measurable annual goals" designed to "meet the child's needs that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(i)(II).

In this case, the IEP included a "specifically designed instruction" requiring staff to reward good behavior around "aversive tasks such as toileting." HOD at 4, ¶ 16. In April of D.H.'s kindergarten year, a goal of no toileting accidents for four weeks was added, but with no

---

[3]      The Court's conclusion about D.H.'s performance in first grade bears on the hearing officer's evaluation of plan *content* as well. As a matter of IEP content, the revisions made by the IEP team in April 2015 were inadequate.

mention of how the goal would be reached. The Court concludes that these statements do not constitute an adequate toileting plan.[4]

Indeed, D.H.'s persistent toileting issues confirm that whatever "plan" the district had in place was inadequate. *Cf. Endrew F.*, 137 S. Ct. at 996 (noting that, when a student's IEPs "carr[y] over the same basic goals and objectives from one year to the next," the student has "fail[ed] to make meaningful progress toward his aims"); *Brandywine Heights Area Sch. Dist. v. B.M.*, 248 F. Supp. 3d 618, 631–32 (E.D. Pa. 2017) (attributing a school district "inability to reduce [a student's] behaviors to a manageable level" to the fact that the district "allowed those behaviors to get out of hand from the start").

## B. Reactive, Crisis-Oriented Strategies in the Behavior Plan

As explained above, the hearing officer found that the school district reactively went from crisis to crisis instead of proactively supporting D.H. A positive behavior support plan must "include methods that utilize *positive* reinforcement and other *positive* techniques to shape a student's . . . behavior, ranging from the use of *positive* verbal statements as a reward for good behavior to specific tangible rewards." 22 Pa. Code § 14.133(b) (emphasis added).

The school district argues that the hearing officer gave short shrift to the positive (and preventative) support afforded to D.H. To be sure, the district offered some preventative support. *See, e.g.*, HOD at 9 (the "star" chart). Nevertheless, the Court agrees with the hearing officer's conclusion that whatever preventative tools the district employed were overwhelmed by the plethora of reactive and crisis-oriented strategies in the IEP. *See* HOD at 22–23.

---

[4]     The Court is reminded of the proverb, sometimes attributed to Antoine de Saint Exupery, and lately popularized by Coach Herm Edwards, that "a goal without a plan is a wish."

### C. Eligibility for Extended School Year after First Grade

The school district argues that the hearing officer was wrong to fault the IEP team for removing ESY eligibility from D.H.'s education plan in first grade and for awarding compensatory education for the summer months on that basis. In the district's telling, D.H. was doing so well in first grade that the education team reasonably concluded that summer school was not needed.

The IDEA requires education teams to consider an "extended school year" for students with special needs. *See* 34 C.F.R. § 300.106. "Extended school year services must be provided only if a child's IEP team determines, on an individual basis . . . that the services are necessary for the provision of FAPE to the child." *Id.* § 300.106(a)(2). ESY services "are only necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months." *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 566 (E.D. Pa. 2013) (quoting *M.M. v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 537–38 (4th Cir. 2002)). "The type of jeopardy necessary to require ESY services is not merely a risk of regression, as this is a risk that is experienced by all students. Instead, ESY services are only required to assure a FAPE where such regression will substantially thwart the goal of 'meaningful progress.'" *Id.* (quoting *M.M.*, 303 F.3d at 538).

Pennsylvania provides seven factors for educators to consider in "determining whether a student with disabilities requires ESY":

    i.    **Regression:** Whether the student will revert to a lower level of functioning as a result of an interruption in educational programming;

    ii.    **Recoupment:** Whether the student can recover the skills in which regression occurred;

iii.   **Maintenance:** Whether the student's difficulties with regression and recoupment make it unlikely that the student will maintain the skills relevant to his goals;

iv.   **Mastery:** The extent to which the student has mastered a skill at the point when educational programming would be interrupted;

v.   **Self-Sufficiency:** The extent to which a skill is crucial for the student to meet his goals of self-sufficiency;

vi.   **Withdrawal:** The extent to which interruptions in educational programming result in a student's withdrawal from the learning process; and

vii.   **Disability:** Whether the student has a severe disability such as autism.

*See* 22 Pa. Code § 14.132(a)(2).

In this case, the hearing officer appropriately considered the seven factors. D.H. has autism. He had regressed in the past — at the beginning of first grade, and over the holiday break during first grade. He made no progress on communication skills or on toileting during first grade. Because the record supports the hearing officer's conclusion that D.H. did not make great improvement in first grade, as discussed elsewhere in this Memorandum, the Court concludes that the hearing officer was also correct that the school district should have found D.H. eligible for extended school year.

### D.  Use of Physical Restraints

The persistent use of physical restraints over three years suggests that whatever "plan" the district had in place was inadequate. "The use of restraints is considered a measure of last resort, only to be used after other less restrictive measures, including de-escalation techniques." 22 Pa. Code § 14.133(a); *see also id.* § 711.46(a) (same). "Restraints to control acute or episodic aggressive or self-injurious behavior may be used only when the student is acting in a manner as to be a clear and present danger to himself, to other students or to employees." *Id.* § 14.133(c);

*see also Damian J. v. Sch. Dist. of Phila.*, No. 06-cv-3866, 2008 WL 191176, at *5 (E.D. Pa. Jan. 22, 2008) (same). The "unreasonable use of restraints" is prohibited. 22 Pa. Code § 14.133(a).

Even accepting the school district's argument that its use of restraints was always reasonable, the persistent use of such a measure is a red flag. A tool meant as a "last resort", deployed dozens of times over three years, is strong evidence that the behavior plan was not working.

The Court is mindful that the use of restraints does not always mean that an IEP has failed. *See CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 639 (8th Cir. 2003) ("We of course very much regret that CJN was subject to an increased amount of restraint in his third-grade year, but that fact alone does not make his education inappropriate within the meaning of the IDEA."). Nevertheless, the persistent use of physical restraints over three years confirms that whatever "plan" the district had in place was inadequate. *Cf. Endrew F.*, 137 S. Ct. at 996 (noting that, when a student's IEPs "carr[y] over the same basic goals and objectives from one year to the next," the student has "fail[ed] to make meaningful progress toward his aims"); *Brandywine Heights*, 248 F. Supp. 3d at 631–32 (attributing a school district "inability to reduce [a student's] behaviors to a manageable level" to the fact that the district "allowed those behaviors to get out of hand from the start").

### HEARING OFFICER'S CONCLUSIONS ON REMEDY

In her decision, the hearing officer ordered a two-part remedy. First, she ordered that the school district pay compensatory education to D.H. Second, she ordered that a BCBA attend all of D.H.'s future IEP meetings. For the reasons that follow, the Court will remand to the hearing officer with instructions to modify both parts of her order as to a remedy.

## I. Compensatory Education

The hearing officer awarded D.H. four hours of compensatory education for each day of first and second grade, plus full days for ESY in the summer after first grade.

The concept is that compensatory education "restore[s] the child to the educational path he or she would have traveled but for the deprivation" of FAPE. *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608, 625 (3d Cir. 2015). Under the hour-for-hour approach applied in this case, the student is "entitled to compensatory education for a period equal to the period of deprivation, excluding only the time reasonably required for the school district to rectify the problem." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012) (quoting *M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 391–92 (3d Cir. 1996)). Compensatory education is an equitable remedy that requires a court to consider all factors. *Id.*

The school district argues (1) that the award of four hours per day was too rough an estimate and (2) that the hearing officer failed to give the school a rectification period to adjust to D.H.'s behavior. The Court agrees with the first argument but rejects the second.

***First***, the district argues that the hearing officer erred by awarding compensatory education for days when D.H. was fully in class without any incidents. The blanket award of four hours per day, day in and day out, in other words, was too rough an estimate.

The Court agrees. For instance, for the month of May 2015, the hearing officer found that D.H. had a toileting accident on May 4 and was subject to a seated restraint on May 24. Yet, under the blanket award of four hours per day, D.H. is entitled to 78 hours for the month.

To be sure, courts are often necessarily indulgent of rough hourly estimates. *See, e.g.*, *G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455, 468 (E.D. Pa. 2011); *Damian J.*, 2008 WL 191176, at *7 n.16. Furthermore, the Court recognizes that only two incidents were *recorded* in May 2015; others may have gone unrecorded. Finally, the Court is mindful that an emotional

meltdown at the end of the school day could wipe out the entire day's progress. *Cf. Tyler W. v. Upper Perkiomen Sch. Dist.*, 963 F. Supp. 2d 427, 439 (E.D. Pa. 2013) ("Where a student makes little to no academic progress, it indicates that the District's failure to address his needs pervaded and undermined his entire school day."). Indeed, in seemingly uneventful days after a toileting accident, D.H. may have been too embarrassed around his peers to focus on learning.

Even accounting for these considerations, however, the May 2015 award — and others like it — is too far out of step and without documented reference. On remand, if the hearing officer still concludes that FAPE was denied, she should reevaluate the hourly award, paying closer attention to monthly, weekly, and daily variations in D.H.'s performance.

***Second***, the school district argues that the hearing officer failed to give the school a rectification period to adjust to D.H.'s behavior. The ultimate hourly award should be the total time that FAPE was denied minus "the time reasonably required for the school district to rectify the problem." *D.K.*, 696 F.3d at 249 (quoting *M.C.*, 81 F.3d at 391–92).

Here, the school district's objection overlooks that the school had all of D.H.'s kindergarten year to rectify the behavioral plan. *See* HOD at 26. And the rectification clock did not restart in first grade. As explained above, the Court agrees with the hearing officer that D.H.'s first grade year was not as rosy as the school district portrays it. *Cf. Brandywine Heights*, 248 F. Supp. 3d at 629 ("[T]he District had ample notice of the types of disruptive behaviors that [the student] had been known to engage in and ample time to put in place a proper plan to address them, but ultimately failed to craft an IEP that was responsive to those concerns. This is not a case where the District needed time to react to a previously-unforeseen deficiency in an IEP.").

## II.    Mandatory Attendance by BCBA at Future IEP Meetings

In addition to compensatory education, the hearing officer ordered that a BCBA attend every future IEP meeting for D.H.  The school district argues that this order was an abuse of discretion.

The Court agrees with the hearing officer that D.H.'s serious behavioral problems very likely warrant the skills of a BCBA.  But, as an equitable matter, the Court sees no compelling reason to require a BCBA to attend D.H.'s IEP meetings *in perpetuity*.  Exercising its equitable powers to fashion a remedy under the IDEA, the Court orders that a BCBA attend D.H.'s IEP meetings only until the end of calendar year 2019, or such earlier time as all parties may agree upon.[5]

### SUMMARY OF REMAND

In sum, the case is remanded to the hearing officer for proceedings consistent with this Memorandum.  On remand, the hearing officer should focus on three areas:

*1. Denial of FAPE*. — The hearing officer's conclusion that FAPE was denied rested on several interlocking factors.  In this Memorandum, the Court upheld the validity of some factors and dismissed others.  On remand, the hearing officer should reevaluate her conclusion that FAPE was denied in light of the Court's conclusions, including the Court's instructions that (i) only one absence by the regular education teacher could properly count against the school district, (ii) the effect of the pre-kindergarten FBA must be considered, and (iii) a subsequent

---

[5]    After the school district brought this case to overturn the hearing officer's decision, D.H. filed a counterclaim asking the Court to resolve three issues: (1) the hourly rate for D.H.'s compensatory education, (2) whether the compensatory education award should be placed in a third-party trust rather than be administered directly by the school district, and (3) attorney's fees under 20 U.S.C. § 1415(i)(3)(B).  The school district has filed a motion to dismiss the counterclaim.

Because the Court is remanding the case to the hearing officer for further deliberations, the motion to dismiss is deemed moot.  On remand, the hearing officer may consider the relief sought in the counterclaim.

FBA by a BCBA was not required by law. *Cf. Reid v. D.C.*, 401 F.3d 516, 526 (D.C. Cir. 2005); *Braden O. v. W. Chester Area Sch. Dist.*, No. CV 16-0071, 2017 WL 2869397, at *7 (E.D. Pa. July 5, 2017).

2. ***Hours of Compensatory Education***. — If the hearing officer again concludes that FAPE was denied, then she should reevaluate the hourly award, paying closer attention to monthly, weekly, and daily variations in D.H.'s performance and any documentation of the shortcomings at issue. *Cf. Stanton v. District of Columbia*, 680 F. Supp. 2d 201, 203 (D.D.C. 2010).

3. ***Issues Raised in Counterclaim***. — If the hearing officer again concludes that FAPE was denied, and after reevaluating the hourly award, the hearing officer should consider the relief sought in D.H. and N.H.'s counterclaim, including whether monetary relief should be awarded in the form of a third-party trust and the provable dollar value of each hour of compensatory education. *Cf. I.K. v. Sch. Dist. of Haverford Twp.*, 961 F. Supp. 2d 674, 682 (E.D. Pa. 2013); *Blake C. v. Dep't of Educ.*, No. 06-cv-335, 2007 WL 1240211, at *2 (D. Haw. Apr. 26, 2007).

## CONCLUSION

For the foregoing reasons, (i) the school district's motion for judgment on the administrative record is granted in part and denied in part, (ii) the school district's motion to dismiss is deemed moot, and (iii) the case is remanded to the hearing officer for proceedings consistent with this Memorandum. An appropriate order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

I.   **Pre-Kindergarten (early 2013)**

| IEP Meeting on May 2, 2013 – Hearing Officer Decision (HOD) at 4, ¶¶ 14–20 | |
|---|---|
| School Year | • Pre-Kindergarten |
| Notable Attendance | • No BCBA or other behavior specialist attended. |
| Inputs Considered | • Transition evaluation conducted at the end of pre-kindergarten.  *See* HOD at 3, ¶¶ 5–10.<br>• The transition evaluation was partially based on a behavior analysis from D.H.'s preschool staff, ***not*** from a behavior specialist or BCBA.  HOD at 4, ¶ 11. |
| Findings | • The transition evaluation concluded that D.H. was autistic with speech/language impairment. |
| Pertinent Plan | • Regular sessions for speech/language therapy, physical therapy, and occupational therapy.<br>• **Behavior**: Behavior plan existed but did not address toileting.<br>• **Toileting**: The closest that this IEP came to a toileting plan was a "specifically designed instruction" requiring "shaping" — that is, rewarding good behavior — "for aversive tasks such as toileting."  HOD at 4, ¶ 16. |
| Level of Autistic Support | • Itinerant Autistic Support.  D.H. was in the regular school setting except for his periodic therapy sessions.<br>• This is the lowest of three levels of support.  The others are "supplemental autistic support" and "full-time autistic support." |
| Incidents after Meeting | • The hearing officer did not note any behavior incidents in early kindergarten. |

## II.    Kindergarten (2013-2014)

| IEP Meeting on October 16, 2013 – Hearing Officer Decision at 5, ¶¶ 22–26 | |
|---|---|
| School Year | • Kindergarten |
| Notable Attendance | • D.H.'s regular classroom teacher did not attend.<br>• D.H.'s speech/language therapist did not attend.<br>• Neither a behavior specialist nor a BCBA attended.  This is particularly important because, as noted below, the IEP team added the use of physical restraints to this version of the IEP. |
| Pertinent Plan Revisions | • **Physical therapy**:  Adaptive physical education was added to the IEP.<br>• **Behavior**: The use of **physical restraints** was added as a last resort when D.H. was a danger to himself or others. |
| Level of Autistic Support | • Unchanged.  Still itinerant autistic support. |
| Incidents after Meeting – January 14 to June 2, 2014 | • **Toileting**: 18 accidents.  HOD at 5, ¶ 29.<br>• **Restraints**: 6 uses.  HOD at 5, ¶ 30.  Seated restraints were used on February 21 and March 5, 2014.<br>• **Early Pick-Ups**:  Family members were called to pick D.H. up from school 15 times.  HOD at 5, ¶ 29. |

| IEP Meeting on March 5, 2014 – Hearing Officer Decision at 6, ¶¶ 32–37 |  |
|---|---|
| School Year | • Kindergarten |
| Notable Attendance | • A behavior specialist attended.<br>• D.H.'s speech/language therapist, occupational therapist, and physical therapist did not attend. |
| Inputs Considered | • In February 2014, the school district enlisted a board certified behavior analyst (BCBA) to revise D.H.'s behavior plan.<br>• However, an FBA was not conducted. |
| Pertinent Plan Revisions | • **Behavior**: Behavior plan was slightly revised in light of BCBA's findings.<br>• Unchanged: No provision for D.H.'s teachers to consult with the BCBA.<br>• Unchanged: No provision for "targeted intensive toileting support." HOD at 6, ¶ 36. |
| Level of Autistic Support | • Increased from the lowest-level "itinerant autistic support" to medium-level "supplemental autistic support." |
| Incidents after Meeting – March and April 2014 | • **Toileting**: 6 accidents in a 10-day span in early April. HOD at 7, ¶ 41.<br>• "**Significant behavioral episodes**" on April 4, 10, and 13. *Id.*<br>• **Restraints**: 2 seated restraints on March 7. The restraints were used according to the October 2013 behavior plan, not the new March 2014 plan. And a restraint timer was used, in contravention of the plan. HOD at 6, ¶ 39. |

| IEP Meeting on April 16, 2014 – Hearing Officer Decision at 7 | |
|---|---|
| School Year | • Kindergarten |
| Notable Attendance | • No behavior specialist or BCBA attended. |
| Inputs Considered | • No FBA was conducted.<br>• IEP team found that D.H. had tantrums once per week and that his behaviors had improved in the previous two weeks. |
| Pertinent Plan Revisions | • Behavior Additions: Teaching D.H. to identify and communicate feelings.<br>• Behavior Additions: Teaching D.H. to use "gentle hands."<br>• **Crisis Plan**: An eight-step "crisis plan" was added to address D.H.'s outbursts.<br>• **Toileting**: A goal of no accidents for four weeks was added, with no mention of how the goal would be reached.<br>• Still no provision for D.H.'s teachers to consult with the BCBA.<br>• Still no provision for FBA or other behavioral assessment.<br>• **Extended School Year** (ESY): D.H. was deemed eligible for summer school for 2014. |
| Level of Autistic Support | • Increased from medium-level "supplemental autistic support" to the most intensive "full-time autistic support."<br>• D.H. would now spend five hours per day with a personal care assistant. |
| Incidents after Meeting – April to June 2014 | • Multiple **restraints** on April 24, 2014 and May 16, 2014.<br>• **Toileting accident** followed by three seated restraints on June 2, 2014. HOD at 7, ¶¶ 48–50. |

## III.    First Grade (2014-2015)

| IEP Meeting on April 7, 2015 – Hearing Officer Decision at 9, ¶¶ 60–69 | |
|---|---|
| School Year | • First Grade |
| Notable Attendance | • No behavior specialist or BCBA attended. In fact, the school district's new BCBA, hired in January 2015, did not learn about D.H. until October 2015.<br>• D.H.'s speech/language therapist did not attend.<br>• With D.H.'s mother's consent, D.H.'s regular education teacher did not attend. |
| Inputs Considered | • No FBA was conducted.<br>• No BCBA met with D.H.<br>• Without D.H.'s regular education teacher in attendance, the IEP Team never heard her view any time in first grade. |
| Pertinent Plan Revisions | • Speech/Language: In March 2015, the school district had found no progress on D.H.'s goal for communicating feelings and the speech/language therapist did not attend the IEP meeting. Even so, the IEP was revised to remove D.H. from speech/language services.<br>• **Behavior**: A minor change to D.H.'s behavior plan was the elimination of the "reinforcement item" of sticking a star on D.H.'s behavior chart.<br>• Still no provision for FBA or other behavioral assessment.<br>• **Extended School Year**: D.H. was deemed ineligible for summer school for 2015. HOD at 10, ¶ 71. |
| Level of Autistic Support | • Decreased two levels, from the most intensive "full-time autistic support" to the least intensive "itinerant autistic support." |
| Incidents after Meeting – April to May 2015 | • **Restraints**: A seated restraint was used on May 24, 2015.<br>• **Toileting**: D.H. had toileting accidents on April 17, April 23, and May 4, 2015. |

## IV.    Second Grade (2015-2016)

| IEP Informal Meeting on October 2, 2015 – Hearing Officer Decision at 10, ¶¶ 76–78 | |
|---|---|
| School Year | • Second Grade |
| Notable Attendance | • D.H.'s autistic support teacher and the school principal attended.<br>• D.H.'s family members, including his mother, attended.<br>• Even though the recent use of restraints was the reason for the meeting, no behavior specialist or BCBA attended. |
| Inputs Considered | • Findings:  At the beginning of second grade, the school had failed to staff the five-hours-per-day personal care assistant, in contravention of the IEP. |
| Pertinent Plan Revisions | • At parent's request, D.H. received modified homework, access to a quiet workspace, and noise-cancelling headphones.<br>• Behavior:  Still no provision for FBA or other behavioral assessment.  But the school district's BCBA began working with D.H. on October 15.<br>• Behavior:  D.H.'s original personal care assistant, back from a leave of absence, was reassigned to D.H. at the family's request on November 2. |
| Incidents after Meeting – October 2015 | • **Restraints**:  Restraints were used twice in October 2015.<br>• **Toileting**:  D.H. had 7 toileting accidents in October 2015.<br>• **Aggression**:  D.H. had four incidents of aggressive behavior in October and early November 2015.<br>• **Early Pick-Up**:  Family members were called to pick D.H. up from school four times.  *See* HOD at 11, ¶¶ 80–90. |

| IEP Meeting on November 6, 2015 – Hearing Officer Decision at 12, ¶¶ 91–99 | |
|---|---|
| School Year | • Second Grade |
| Notable Attendance | • The BCBA and the home-based team attended.<br>• The principal did not attend.<br>• The speech/language, occupational, and physical therapists did not attend. |
| Inputs Considered | • The team agreed to conduct a "reinforce survey" to determine which rewards work best to encourage good behavior in D.H. |
| Pertinent Plan Revisions | • **Behavior**:  The behavior plan was revised to respond to elopement. "Elopement" occurs when children with autism sometimes wander off. The plan provided a ***response*** to elopement, not a strategy to ***prevent*** elopement.<br>• Still no provision for FBA or other behavioral assessment.<br>• No addition of social skills support, even though the IEP team determined that D.H. would be eligible for extended school year for social skills. |
| Level of Autistic Support | • The level of autistic support was raised from "itinerant autistic support" to "supplemental autistic support." |
| Incidents after Meeting – November to December 2015 | • **Restraints**:  A seated restraint was used on November 17, 2015.<br>• **Toileting**:  D.H. was restrained three times after a toileting accident on December 8, 2015.  HOD at 12, ¶¶ 100–01. |

| IEP Meeting on December 14, 2015 – Hearing Officer Decision at 13, ¶¶ 102–03 | |
|---|---|
| School Year | • Second Grade |
| Notable Attendance | • The BCBA attended.<br>• The regular education teacher did not attend. |
| Pertinent Plan Revisions | • **Behavior**: The "crisis" portion of the behavior plan was revised. Staff members were instructed not to talk to D.H. when he was not behaving.<br>• **Toileting**: If D.H. had an accident and would not change, then his family would be called to change him and he would return to class. |
| Incidents after Meeting – December 2015 | • D.H. was **aggressive** toward a staff member on December 15, 2015 and was later suspended one day from school.<br>• D.H. was **restrained** after escaping a task on December 16 and his mother was called to pick him up early.<br>• D.H. was **restrained** twice and had a **toileting** accident on December 17 and was picked up early from school. HOD at 13, ¶¶ 104–06. |

| IEP Meeting on December 22, 2015 – Hearing Officer Decision at 13, ¶¶ 107–09 | |
|---|---|
| School Year | • Second Grade |
| Notable Attendance | • The BCBA attended.<br>• The occupational and physical therapists did not attend. |
| Pertinent Plan Revisions | • **Behavior**: The "crisis" portion of the behavior plan was revised to change the procedures for notifying D.H.'s parent. |
| Level of Autistic Support | • The level of autistic support was raised from "supplemental autistic support" to "full-time autistic support." |
| Incidents after Meeting – Early 2016 | • D.H. was aggressive toward a peer, had a toileting accident, and was picked up early from school on January 22, 2016.<br>• D.H. refused to transition from recess to an academic task on January 27 and was allowed to escape the task, in contravention of his behavior plan.<br>• Staff encouraged D.H. to use words during an outburst on January 28, in contravention of the behavior plan, and D.H. became aggressive.<br>• D.H. was aggressive and had a toileting accident on February 1 and 2, 2016.<br>• D.H. **had 9 more behavior incidents** between February 8 and April 22, 2016. All told, he was **picked up early from school 20 times** in second grade. |

| IEP Meetings on March 8 & April 14, 2016 – Hearing Officer Decision at 15–16, ¶¶ 127–29 | |
|---|---|
| School Year | • Second Grade |
| Inputs Considered | • The recent reevaluation report. |
| Pertinent Plan Revisions | • **Behavior**:  The IEP team added antecedent strategies — that is, strategies to address behavior that ***precedes*** problem behavior.<br>• **Behavior**:  The plan was revised to include **positive consequences** for replacement behavior (that is, good behavior that D.H. exhibits to replace unwanted behavior).<br>• **Transfer to private school**: The IEP team discussed transferring D.H. to another school. |